**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**PRICE WATERHOUSE, Daniel W. Jerbasi, Benjamin W. Perks, and Michael D. LeRoy, Defendants.**

**No. 85 Civ. 4787 (JES).**

United States District Court, S.D. New York.

July 29, 1992.

As Amended Sept. 10 and Sept. 14, 1992.

**1218**

Securities and Exchange Commission, Washington, D.C. (Kevin P. O'Rourke, John Courtade, Nancy R. Grunberg, of counsel), for plaintiff.

Donovan Leisure Newton & Irvine, New York City (David R. Jewell, Charles W. Gerdts, Peter A. Bicks, Jodi E. Freid, of counsel), Eldon Olson, Gen. Counsel, Allen I. Young, Deputy Gen. Counsel, Price Waterhouse, New York City, for defendants.

## OPINION AND ORDER

SPRIZZO, District Judge:

The Securities and Exchange Commission ("SEC" or "Commission") brings this action against defendants Price Waterhouse ("Price Waterhouse" or "PW"), Daniel W. Jerbasi ("Jerbasi"), Benjamin W. Perks ("Perks"), and Michael D. LeRoy ("LeRoy"), (collectively, the "PW defendants"), alleging (1) primary violations of Section 17(a)(1)–(3) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77q(a)(1)–(3) (1988), Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b) (1988) and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5 (1991), and (2) aiding and abetting violations of the aforesaid statutes and regulations and Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a) (1988), and Rules 12b–20 and 13a–1, 17 C.F.R. 240.12b–20 & 240.13a–1 (1991). The Commission seeks broad injunctive relief, to wit: a permanent injunction restraining and enjoining the defendants, and their agents, partners, servants, employees, attorneys and persons acting in concert with them, from violating the anti-fraud provisions of the securities laws.

The Court having held a bench trial, seen and heard the witnesses, reviewed in detail the voluminous deposition transcripts and exhibits proffered by the parties, finds in favor of the defendants. Accordingly, for the reasons stated herein, judgment shall be entered for the defendants. The following shall constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.[1]

## BACKGROUND

A. *AM International, Inc.*

The fraud allegations in the complaint relate to an audit conducted by PW of AM International, Inc. ("AMI") in connection with its financial statements for the fiscal

---

1. References to the evidence shall be as follows: References to the trial transcript are cited as "Tr." and "Houghton Tr." (*transcript of cross-examination of Clarence W. Houghton on Oct. 11, 1990*). Deposition testimony is indicated as "[Last Name of Deponent] Dep." Testimony taken before the Securities and Exchange Commission *is cited as* "[Last name of witness] SEC." Plaintiff's Exhibit references are "Ex. [number]" and defendants' are "Ex. [letter]."

year ended July 31, 1980 ("FY 1980").[2] AMI was a major producer of business equipment, such as systems and supplies for the reproduction and processing of information. *See* JPTO ¶¶ 4, 7. Its principal products included duplicators, imprinters, embossers, photocomposition systems, word processing, and engineering graphics equipment. *See id.* at 4, ¶¶ 7(b), 17(b) & 18. As of July 31, 1980, AMI had thirty wholly-owned divisions or subsidiaries,[3] conducted operations in nineteen countries including the United States, had facilities in twenty-two countries, and operated approximately thirty manufacturing, distribution and/or administrative facilities in the United States. *See id.* at 17, ¶ 17(4)–(5).

When Roy L. Ash became CEO of AMI in 1976, he decided to update the Company's products and acquire companies with the latest in electronic office equipment.[4] *See* Ex. 6; Tr. at 69–70; Gray Dep. at 59–60. Accordingly, he caused the company to purchase companies such as ECRM, Infortext, and Jacquard which manufactured state-of-the-art business equipment. *See* Ex. 6. Ash's business strategy to modernize the company was dependent upon the use of the company's more established divisions, such as the Multigraphics Division, to provide the cash needed to fund the early operations of the newly acquired high-tech companies. *See* Tr. at 69; Exs. 6, 7; Gray Dep. at 59–60; Kaufman Dep. at 46–48.

However, the results were poor. The earnings and income of the more established divisions declined while the costs associated with the new companies increased. *See* Ex. 7; Gray Dep. at 59–60. As a consequence, the company began to suffer from a shortage of cash, increased its debt, and planned a public offering for securities which was supposed to take place in September of 1980.[5] *See* Ex. 62; Coo Dep. at 14–17; Pope Dep. at 99–103. That offering was postponed, however, based at least in part upon the reactions of the company's investment advisors to the company's 1980 financial statements. *See* Tr. at 975–80; Ross Dep. at 20–25; Gelles Dep. at 36–37.

AMI's consolidated financial statements for the fiscal year ended July 31, 1980, as to which PW audited and issued an unqualified opinion, reported revenues of $909,647,000 and pre-tax losses, before special items, of $1,540,000. *See* Ex. 455a (1980 Annual Report and Financial Statements) at 1, 36. The company also reported net income of $5,800,000, which was largely the result of tax credits and other non-recurring items, and total assets of $686,132,000. *See id.* However, notwithstanding these financial statements, which constituted a substantial decline from FY 1979,[6] AMI's management stated in the annual report that although profit from normal opera-

---

**2.** AMI was a multinational corporation organized and existing under the laws of the state of Delaware. Its corporate headquarters was located in Cleveland, Ohio until June 1978 when it was moved to Los Angeles, California. *See* Joint Pre-Trial Order ("JPTO") ¶¶ 4–5. Subsequently, in September 1981, AMI moved its headquarters to Chicago, Illinois. *See id.*

**3.** Particularly relevant to this action are the following subsidiaries or divisions: (1) the AM Multigraphics Division ("Multigraphics"), which was responsible for the duplicator product lines; (2) the AM Services Division ("AM Services"), which was responsible for servicing and repairing AMI products; (3) the AM Varityper Division ("Varityper"), which was responsible for the composition and word processing product lines; (4) the AM Jacquard Division ("Jacquard"), which was a division that was formed when AMI purchased Jacquard, a company engaged in the manufacture of small business computers, in December 1979; and (5) the AM

Leasing Company ("AMLC"), a wholly owned subsidiary, which was utilized to enable customers to finance their purchase of equipment from the various other divisions of AMI. *See generally* Ex. 119 at 10–16.

**4.** In 1976 Ash changed the name of the corporation from Addressograph–Multigraph Corporation to AM International, Inc.

**5.** At all times relevant to this action, AMI's stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act, and was traded on the New York, Midwest, and Pacific Stock Exchanges. *See* JPTO ¶¶ 4, 6.

**6.** For comparison, AMI reported the following financial condition for the fiscal year ending July 31, 1979. In FY 1979, AMI reported that revenues were $754,483,000; pre-tax income was $16,844,000; net income was $11,600,000; and total assets were $544,240,000. *See* Ex. 455a (1980 Financial Statement) at 1, 36.

tions was below expectations, there was a distinct quarter-to-quarter improvement in operation performance during the year. This improvement, as well as their optimism for the newly acquired businesses, led management to be "confident that the most turbulent times are now behind us." That opinion proved to be ill founded, as the financial statements for FY 1981 demonstrate.[7]

Since, as noted above, the company's fortunes declined, on February 20, 1981, Ash was forced to resign as CEO and was replaced by Richard Black. Black replaced many of the high level executives who had played important roles during FY 1980, including James H. Combes, the Chief Financial Officer. Shortly after Black's appointment as CEO, Jerbasi wrote a memorandum for Black identifying potential adjustments to AMI's financial statements. That memorandum, dated March 19, 1981, quantified approximately $25.7 million dollars in adjustments, *see* Ex. 125, which Jerbasi maintained that PW learned of after it concluded the audit for FY 1980. Moreover, because of AMI's financial difficulties in

1981, it was unable to issue its financial statements in September or October of 1981.

As a consequence, the Board commissioned Arthur Andersen & Co. ("AA") to perform a review of the 1980 audit to determine if there were any adjustments which should have been entered in AMI's books and records for 1980. *See* Black Dep. at 56–57, 63. AA issued a draft document which stated that a large number of adjusting entries should have been recorded to the 1980 financial statements.[8] Finally, after several meetings with Black, Joseph Freeman (the new comptroller), representatives of AA, PW and AMI's attorneys, at which the draft document's conclusions were debated, AMI dismissed PW as its auditors and retained AA in December 1981. Ultimately, on April 13, 1982, AMI filed a voluntary petition for relief under Chapter II of the Bankruptcy Code in the Northern District of Illinois.

### B. *Price Waterhouse*

Defendant Price Waterhouse was and still is a partnership engaged in public ac-

---

**7.** In 1981, revenues declined to $652,712,000; pre-tax loss increased to $81,012,000; total assets declined to $546,213,000 and there was a net loss of $245,051,000. *See* Ex. 457a (AMI's 1981 10–K) at 35.

**8.** The Commission relies upon this draft report prepared by AA in November 1981 and the documentation supporting it as evidence that the PW defendants were reckless. *See* Exs. 204–12. This report was prepared by AA at the request of AMI's counsel, Schiff, Hardin & Waite ("Schiff Hardin"), in anticipation of the litigation that was expected following the Company's dismal financial statements for FY 1981. The report, which was not prepared in accordance with generally accepted auditing standards, was based primarily upon interviews with individuals who were still employed by AMI in the Fall of 1981 and AMI documents that could be located. Former employees, some of whom had played major roles in the 1980 audit, were not interviewed on Schiff Hardin's instructions, *see* Kutsenda Dep. at 462, and AA was not provided with PW documents.

The PW defendants object to these items on the ground that the report and the supporting documents are inadmissible hearsay. The Court agrees. The AA report does not fall within the "business records" exception to the hearsay rule, Fed.R.Evid. 803(b), because it was not prepared in the ordinary course of business, but instead

was prepared in contemplation of litigation. *See e.g., Paddack v. Dave Christensen Inc.,* 745 F.2d 1254, 1258 (9th·Cir.1984); *Osterneck v. E.T. Barwick Indus., Inc.,* 106 F.R.D. 327, 333 (N.D.Ga.1984). It also fails to satisfy the "public records or reports" exception to the hearsay rule, *see* Fed.R.Evid. 803(8), because it is a report prepared by a privately retained accounting firm for a company, and thus is not a report or investigation by a public office or agency. *See McKinnon v. Skil Corp.,* 638 F.2d 270, 278–79 (1st Cir.1981); *Osterneck, supra,* 106 F.R.D. at 333. Moreover, since it is based largely upon hearsay and many of AA's workpapers and the AMI documents supporting it were unavailable to the PW defendants, it is therefore not admissible as a summary of evidence under Fed.R.Evid. 1006. *See Paddack, supra,* 745 F.2d at 1259–60. In any event, the Court has reviewed that report, and the related exhibits noted above, and has concluded that even assuming arguendo that it were admissible, the Court would not find it sufficiently persuasive to alter its conclusion, that based upon all of the evidence, the complaint must be dismissed.

However, the Court will consider that report as admissible for the *limited* purpose of explaining the basis for the opinion of the SEC's expert witness who relied upon it. Dye Decl. ¶ 35; *see* Fed.R.Evid. 703; *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1270–71 (7th Cir.1988); *Paddack, supra,* 745 F.2d at 1261–62.

counting organized and existing pursuant to an agreement governed by the laws of the State of New York and having its principal place of business in the State of New York.[9] *See* JPTO at 3, ¶ 1.

Price Waterhouse began serving as independent auditors for AMI prior to 1978, *see* JPTO at 3, ¶ 2, and audited the company's books for the fiscal years ending July 31, 1978 through July 31, 1980. *See* JPTO at 3, ¶¶ 2–3; Tr. at 284–87. PW was retained to audit the fiscal year ending in July 31, 1981, but as noted above, was discharged in December 1981. *See* JPTO at 3, ¶ 4. Price Waterhouse's Los Angeles office ("PW–LA") was responsible for the overall conduct of the FY 1980 audit. It coordinated the work done by other PW offices in the United States and PW firms in other countries.

Defendant Jerbasi, a partner at PW–LA since July 1, 1970, served as the engagement partner on the examinations of the consolidated financial statements of AMI for FY 1979, FY 1980, and FY 1981 and the second partner on the FY 1978 examination. *See* JPTO at 6, ¶ 12. Defendant LeRoy was a senior manager at PW–LA and served in that capacity on the examinations of AMI's consolidated financial statements for FY 1979, FY 1980, and FY 1981.[10] *See* JPTO at 7, ¶ 14.

Perks, also an individual defendant in this action, has been a partner of PW since July 1, 1978. He was the partner in PW's Chicago office ("PW–Chicago") responsible for the audit procedures performed at AMI's unincorporated divisions located in the Chicago area for the FY 1978, FY 1979 and FY 1980 examinations. *See* JPTO at 7, ¶ 13. These divisions included Multigraphics, AM Addressograph, AM Bruning, AM Services, and AM Infortext. Moreover, he was the engagement partner for the examination of the financial statements of AMLC, which was an unconsolidated subsidiary of AMI, on which PW issued a separate report.[11] *See id.*

### C. *The Planning and Scope of the 1980 Audit of AMI*

Jerbasi, LeRoy and Steven W. Bills, a PW–LA manager on the engagement, began preparing for the audit of FY 1980 in early 1980. *See* Tr. at 286–87. Based upon discussions amongst themselves and with AMI officials, and their experiences as auditors, including prior audit experience with AMI, the three prepared a series of detailed planning memoranda for the audit. *See* Tr. at 286–89; Ex. 119; Exs. AX, B, C, D. These memoranda included specific instructions to each of the offices of the United States PW firm and the various foreign PW firms that were to perform some of the necessary auditing procedures and identified specific areas which Jerbasi and LeRoy felt warranted additional attention. Most prominent among these were accounts receivable, inventories and sales. *See* Ex. 119 at 28–29. The instructions also requested that all of the PW offices and/or firms involved provide PW–LA with an inter-office report or in some cases a full scale memorandum on examination summarizing their findings and raising issues which required resolution at the corporate level. *See* JPTO at 16, ¶ 3.

---

**9.** The Price Waterhouse firm in the United States was a separate and autonomous partnership from the firms practicing under the Price Waterhouse name in other countries. However, in 1980, all of the partners of the United States PW firm as well as all of the partners of each PW firm abroad were also partners of Price Waterhouse International, which did not practice accounting or share fees. Its function was to formulate policies for the coordination of the practices of the Price Waterhouse firms in a worldwide context. Price Waterhouse International was succeeded on July 1, 1982 by Price Waterhouse–World Firm, Ltd. which is a non-practicing entity responsible for the development of quality control standards.

**10.** Mr. LeRoy was elected to partnership at PW on July 1, 1982. On June 30, 1989, he resigned from the firm to assume a position as Managing Director of a private merchant banking concern. He has stated that he has no present intention of returning to the practice of public accounting or of obtaining a position that would include reporting responsibility with any SEC registrant. *See* JPTO at 7, ¶ 14; Tr. at 260–61; Affidavit of LeRoy ¶¶ 5–7 (February 1, 1990). This testimony has not been controverted by the Commission and the Court accepts it as true.

**11.** Jerbasi was the second partner assigned to this examination.

As the examination progressed and the PW auditors identified problem areas, the scope of the audit was significantly expanded. For example, PW auditors spent significant additional time at Jacquard, Addressograph, Multigraphics, AMLC, Varityper and AMI's United Kingdom ("UK") operations. *See* Tr. at 293–95, 499–500; Kilgust Dep. at 193–94; Lohmeyer Dep. at 151–53; Ex. 78. Indeed, PW expended 29,-331 hours on the FY 1980 examination, which was far more than had been contemplated in 1977, when PW agreed to its fee for the examination, or even in early 1980, when Jerbasi and LeRoy planned the audit. *See* Tr. at 292–95; Ex. LC.

This expansion of time spent on the audit caused it to be unprofitable for PW. The amount of fees for the audit was fixed by an agreement negotiated in 1977 by Walton W. Kingsbery, a PW partner then at the Cleveland, Ohio office.[12] That agreement provided that PW would receive $480,000 [13] for the 1980 examination, which included a $100,000 discount, based upon an estimate of 18,100 hours for the audit, with some provision for additional fees for uncontemplated work. *See* Tr. at 298–99; Ex. 305. However, because of AMI's growth and poor internal controls, PW was forced to expend large amounts of additional time on the FY 1980 audit for which it would not be compensated.[14] *See* Tr. at 303; Exs. 78, 135. At trial, Jerbasi testified that at all times he instructed other PW personnel to expend whatever hours were necessary to carry out a thorough examination without regard to fees. *See* Tr. at 297, 303; *see also* Tr. at 499; LeRoy Dep. at 1460. The Court accepts this testimony as credible.

## THE COMMISSION'S CONTENTIONS

The SEC commenced this action on June 20, 1985 by filing a complaint for permanent injunctive relief against PW, Jerbasi, LeRoy, and Perks as well as seven former officers or divisional employees of AMI ("the AMI defendants").[15]

The Commission's complaint, as amended,[16] asserts that in issuing an unqualified opinion on AMI's FY 1980 financial statements, the PW defendants made the following misrepresentations of material fact: (1) that the company's financial statements for the fiscal year ended July 31, 1980 were prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied and (2) that their examination of those financial statements was conducted in accordance with generally accepted accounting standards ("GAAS").[17] *See*

**12.** Kingsbery was the engagement partner for PW's audit of AMI's books and records for FY 1978 on which Jerbasi served as the second partner.

**13.** Subsequently, however, AMI agreed to pay $966,000 in recognition of the fact that the company had grown. *See* Ex. IW. The difference between the actual amount paid and the normal fee amount figure is referred to as an "underrealization." *See* Tr. at 303.

**14.** The total fee for the FY 1980 examination would have been $1,367,611 based upon the total hours expended and PW's normal rate.

**15.** Four of the AMI defendants, James H. Combes, R. Jeffrey Ornstein, Walter Rea, and Daniel C. Clark, entered into consent judgments with the SEC agreeing to be bound by the terms of the injunction while not admitting liability. The remaining AMI defendants, Edgar Bolton, Robert H. Lander, and Richard L. Kaufman moved to dismiss, which motions were denied at Oral Argument on January 30, 1987. *See* January 30, 1987 Transcript at 29, 37. Subsequently, on March 28, 1988, the Court entered a consent judgment against Bolton. Finally, on October 10, 1990 the Commission and defendants Robert H. Lander and Richard L. Kaufman entered into stipulations of dismissal pursuant to Fed.R.Civ.P. 41(a).

**16.** The PW defendants initially moved to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b) & 12(b)(6). That motion was denied in an oral ruling on January 30, 1987. *See* January 30, 1987 Tr. at 15–17. However, the Court directed that the SEC file separate, amended complaints and stated that the PW defendants would be tried separately from the AMI defendants. Following extensive discovery, the PW defendants moved for summary judgment. That motion was denied by order dated March 13, 1990 and the action proceeded to trial.

**17.** "Generally accepted accounting principles" are the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ("AICPA"). These principles establish guidelines for measuring, recording, and classifying the transactions of a business entity. "Generally accepted auditing

Amended Complaint against PW Defendants ¶ 22. The PW defendants are also alleged to have violated the securities laws and aided and abetted AMI personnel in violating the securities laws through their assistance in preparing financial statements which the SEC contends misrepresented AMI's financial position as of July 31, 1980 and inflated income in order to portray the company as experiencing a financial "turnaround."

These claims center upon the following alleged accounting and audit defects which will be addressed in detail below: (A) Multigraphics' treatment of so-called "MIP" leases as sales upon shipment of the equipment to a customer and AMI's recognition of revenue from those transactions at that time on its consolidated financial statements; (B) AMLC's treatment of the MIP transactions as direct-financing leases; (C) an alleged understatement of the allowance for doubtful accounts for AMLC; (D) an alleged failure to expand the scope of the audit sufficiently to examine irregularities in AMI's accounting for the change in year end for foreign subsidiaries; (E) an allegedly improper examination of unreconciled differences in the intercompany accounts between AMLC and certain product divisions; (F) failure to require disclosure of certain accounting changes allegedly having a material effect upon AMI's financial statement; and (G) allegedly improper concessions to AMI management on issues of audit adjustments which resulted in the company booking a lesser amount of adjustments than originally proposed by PW.[18]

### A. Multigraphics' Treatment of the Multigraphics Introductory Program

During FY 1979, Multigraphics instituted a program known as the Multigraphics Introductory Program ("MIP") in order to sell some of its larger pieces of duplicating equipment, which consisted of an offset duplicator, a master imager, and in some cases a collator. *See* JPTO at 18, ¶ 1; Exs. SE ("Multigraphics Duplicator Model TCS/4"), SF ("Multigraphics Duplicator Model TCS/5"). Pursuant to this program Multigraphics would ship the aforesaid equipment to a customer, and would record a sale to AMLC on its books. The customer would then enter into a lease agreement with AMLC and would make nominal rental payments for the first ninety days. During that time, AMLC would hold the transaction in a "leases in progress" account. *See* Affidavit of Clarence W. Houghton ("Houghton Aff.") ¶ 8; Ex. 284.

After ninety days passed, the customer had the option to pay cash for the equipment, return the equipment, or continue the lease agreement with AMLC for twenty-four months, with an option to renew the lease for an additional twelve months. The accounting for these options was as follows: (1) if the customer chose to pay cash for the equipment, AMLC would cancel the lease and transfer the cash to Multigraphics through an inter-company account; (2) if the customer chose to return the equipment, AMLC would return the equipment to Multigraphics and would record a payable from Multigraphics on its books; and (3) if the customer chose to continue the lease, Multigraphics would continue to treat it as a sale to AMLC, while AMLC would record the transaction as a direct financing lease under Financial Accounting

---

standards" are the standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination. *See SEC v. Arthur Young & Co.,* 590 F.2d 785, 788 n. 2, 4 (9th Cir.1979). Rule 202 of the Rules of Conduct of the Code of Professional Ethics of the AICPA requires members to comply with GAAP and GAAS when giving an opinion on financial statements.

**18.** Other alleged audit deficiencies include: (1) failure to properly investigate a journal entry in Multigraphics' books which shifted $1.9 million

dollars in revenue from the third quarter to the fourth quarter; (2) failure to properly follow up upon evidence that Jacquard was keeping its books open in the second quarter of FY 1980; (3) failure to eliminate gross profit resulting from sales between subsidiaries and/or divisions in the international consolidation of divisions; (4) failure to obtain a letter warranting the accuracy of Multigraphics' financial statements from Multigraphics' management; and (5) inadequate review of the audit by a second partner.

Statement 13 ("FAS 13").[19] *See* Declaration of Peter S. Dye ("Dye Decl.") ¶¶ 59–60; Affidavit of Samuel Gunther ("Gunther Aff.") ¶¶ 9–10; Houghton Aff. ¶¶ 8–9; Ex. 122 at PWC 0384–85; Ex. 188 at PW 2495–96, Ex. GB, Ex. GO; Tr. at 936–938. Since Multigraphics recognized sales revenue at the time the MIP equipment was initially shipped to a customer it also booked a reserve for estimated returns.

Richard R. Kilgust, now a PW partner, was a manager in PW's Chicago office assigned to the 1979 examination of AMI's Reprographics group, which included the Multigraphics, Addressograph and Infortext divisions.[20] The Court accepts as true his testimony that he was first confronted with the issue of whether AMI could properly recognize revenue on the MIP transactions in the fashion described above in connection with his work on the 1979 examination. *See* Tr. at 786–801; Kilgust Dep. at 345–66, 441. At that time he reviewed a MIP agreement, learned about the type of equipment involved in the program, and spoke to AMI officials about the MIP plan. *See* Tr. at 788–95; Kilgust Dep. at 366–67. He also spoke to Edward J. Keller, the PW–Chicago manager involved in the examination of AMLC to ascertain how AMLC recorded the transactions.[21] *See* Tr. at 789–95; Kilgust Dep. at 442–49.

Kilgust testified that AMLC's treatment of the MIP leases was germane to his inquiry because if AMLC treated the MIP leases as "direct financing leases," where the customer chose the lease option, it would be consistent with Multigraphics' treatment of the transaction as a sale, because the economic substance of a direct financing lease is that there is a transfer of the risk of ownership from AMLC to its lessee which in turn requires that Multigraphics have transferred that risk to AMLC. *See* Tr. at 792–93; Kilgust Dep. at 441–42. Keller advised him that once the customer elected the lease payment option AMLC did treat the MIP leases as direct financing leases. Accordingly, based upon this investigation and his assessment of the economic substance of the MIP leases, Kilgust concluded that the MIP leases were, in fact, sales and that revenue recognition upon shipment was appropriate provided that Multigraphics made an adequate allowance for potential returns in the event that the customer chose to return the equipment to Multigraphics. *See* Tr. at 789; 796–801; Kilgust Dep. at 441–42; *see also* Tr. at 801–02. He testified that he discussed this conclusion with Perks, *see* Kilgust Dep. at 462–63, and, although it was never specifically raised with Jerbasi or LeRoy, *see* Tr. at 194–96, 510; Jerbasi Dep. at 923–25, this conclusion is included in the 1979 memorandum on examination for the Reprographics group.[22] *See* Tr. at 794; Ex. GE at PWC 10249; *see also* Ex. GB. Moreover, the PW–Chicago auditors had no doubt that AMI's accounting treatment of those transactions was correct and therefore did not specifically seek Jerbasi or LeRoy's input as to the correctness of that conclusion. *See* Tr. at 194–96, 336, 510; *see also* Ex. GB.

Since Kilgust had determined that revenue recognition was appropriate only if Multigraphics created an adequate reserve to provide for possible returns, he then focused his attention upon determining what an appropriate reserve should be.

---

**19.** Statement 13 of the Financial Accounting Standards Board ("FAS 13") recognizes three categories of leases: operating leases (which are similar to rentals); "sales-type" leases (which include a manufacturers profit); and direct financing leases (which do not include manufacturers profit). *See* FAS 13 ¶ 6(b). The basic distinction between an operating lease and either a sales-type lease or a direct financing lease is that the latter two types transfer substantially all of the benefits and risks of ownership to the lessee. *See* Houghton Tr. at 59, 76. A direct financing lease is similar to an installment purchase and is, in substance, a sale. *See id.*

**20.** In 1980 Kilgust was the PW–Chicago manager responsible for the audit work performed on those three divisions, which were treated separately in the 1980 audit. *See* Tr. at 786.

**21.** Edward J. Keller was the senior manager at PW–Chicago assigned to the examination of AMLC's books and records for FY 1979, FY 1980 and FY 1981. He died in November 1981.

**22.** Prior to and during FY 1979, Multigraphics was not audited as a separate division of AMI. Rather, it was part of the larger Reprographics group of divisions.

*See* Tr. at 802. Kilgust therefore considered the guidance provided by Statement of Position 75–1 ("SOP 75–1") issued by the Accounting Standards Division of AICPA,[23] as well as his own knowledge of accounting practices and experience as an auditor. *See* Tr. at 802–63; Kilgust Dep. at 468. In implementing those guidelines he and his staff accountants considered the past experience of MIP returns, using records from Multigraphics' sales administration division. *See* Tr. at 803; Kilgust Dep. at 536. Based upon this work, they proposed a $220,000 reserve for MIP returns, which was included in the 1979 memorandum on examination. *See* Ex. GE at PWC 10250.

Having resolved the issue of whether revenue recognition was appropriate in connection with the 1979 audit, Kilgust did not see the need to re-examine that issue in 1980. *See* Tr. at 803. However, since the number of MIP transactions had increased dramatically during the 1980 fiscal year, Kilgust and the staff accountants under his direction expended substantial efforts to determine an appropriate reserve for returns for that year. *See* Tr. at 803–04. They therefore first ascertained the relationship between the number of sales cancelled and returned during the ninety day trial period and those that were not. *See* Fritzche Dep. at 289–92. Based upon their analysis of the returns of MIP equipment since the inception of the program, they determined that the average amount of cancellations was twenty-three percent (23%). *See* Fritzche Dep. at 289–92; Kilgust Dep. at 708; Ex. 188 at PWM 2498. They then applied that figure to the gross profit margin for machines (1) shipped and billed but not installed or cancelled; (2) still in the test period; or (3) past the test period, where the customer's option had not yet been received. *See* Ex. 188 at

PWM 2498. Accordingly, they recommended an allowance for MIP returns of $2,097,000.[24] *See* Ex. 122 at PWC 374, 384; Ex. 188 at PWM 2495. This reserve figure also included $610,000 representing the gross profit on $1,000,000 in MIP sales that had already been cancelled by the customer and billed back by AMLC, but not yet credited by Multigraphics. *See* Tr. at 808–09; Ex. 122 at PWC 384.

The Court finds that PW's accounting treatment of the MIP transaction was consistent with GAAP and that the reserves proposed by PW for future returns constituted a reasonable estimate of those future returns in conformity with GAAS. It follows that the Court must reject the Commission's contention that the aforesaid accounting and audit procedures were so defective as to permit a rational inference of fraud. *See infra* pp. 1240–1244. In support of that conclusion, the Court specifically finds the testimony of PW's expert witnesses, Gunther and Houghton, that the MIP transactions were in substance sales even though they had the appearance of operating leases, credible, persuasive, and well supported by the reasons advanced for their conclusions. *See* Tr. at 754–60, 922–26; Houghton Tr. at 15, 21–25, 67–68; Houghton Aff. ¶¶ 21–23; *see also* Tr. at 801.

Indeed, those opinions and the judgment of the PW auditors, reflect a most basic principle of accounting, *i.e.* that the nature of a transaction be determined by its economic reality and not by its form. By contrast, the Commission and its experts appear to have concluded that the MIP transactions should have been treated as leases largely because they were called "leases" and the payments made were denominated "rental payments." The Court therefore rejects as neither credible nor

**23.** SOP 75–1 was a pronouncement by the AICPA which, although not deemed authoritative at the time of the 1979 audit, provided guidance for recognition of revenue where the customer has the right to return the goods. *See* Declaration of Paul R. LePage ("LePage Decl.") ¶¶ 20, 30.

**24.** PW–Chicago had also proposed a general allowance for doubtful accounts, which did not

include reserves for MIP sales returns, of $1,331,000. *See* Ex. 122 at PWL 374. MIP sales returns were calculated separately from these sales returns because the percentage of MIP returns was significantly higher than normal. *See* Ex. 122 at PWL 384. Thus, it was more accurate to determine those reserves separately. *See* Lohmeyer Dep. at 533–34.

persuasive the Commission's experts with respect to that issue.[25] It follows that the Court also rejects the Commission's contentions that the PW auditors were guilty of fraudulent conduct because they looked to SOP 75-1 rather than to the criteria set forth in FAS 13 in determining the appropriate accounting treatment for the MIP transactions.

Since FAS 13 deals with leases, the Commission and its expert witnesses, in asserting that FAS 13 had to be complied with, assumed the very fact which had to be determined, *i.e.* that the MIP transactions were leases and not sales. Such circular reasoning commends itself neither to logic nor good sense. A more rational approach was that taken by PW and its experts, *i.e.* to examine the economic substance of the MIP transactions and to determine if either the amount of the lease payments, here virtually nominal during the trial period, or other aspects of the lease transactions, in essence supported the conclusion that they, were sales rather than leases.

This is especially true since SOP 75-1, which PW's auditors used in making that determination, is specifically designed to deal with sales providing for an option to return, and permits the recognition of revenue if the following conditions are met: (1) the seller's price was substantially fixed or determinable at the time of the exchange; (2) the buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage to the property; and (3) the amount of future returns could be reasonably predicted. *See* SOP 75-1; Houghton Aff. ¶ 26. The MIP leases at issue here fixed the price of the equipment at the time of shipment and passed the risk of loss to the buyer during the test period. *See* Houghton Aff. ¶ 27; Ex. 284. Therefore, the principal concern here was indeed the one that the PW auditors focused on, *i.e.* whether an appropriate

reserve could be determined to cover future returns.

The Court rejects the testimony of the SEC's experts that future returns were not sufficiently predictable and that the 23% figure used by PW for estimated returns was understated, thereby resulting in an inadequate reserve. *See* Dye Decl. ¶¶ 78–80; Dye Rebuttal Declaration ("Dye Reb.") ¶¶ 15–16; LePage Decl. ¶¶ 42–44; LePage Rebuttal Declaration ("LePage Reb.") ¶¶ 28–29; *compare* Tr. at 803–04, 923–25 (testimony that it was reasonable to estimate returns based upon past experience); Houghton Aff. ¶¶ 28–30 & Exs. P–3; *see also* Ex. 188 at PWM 2499. Indeed, the credible evidence establishes that it was appropriate to recognize income when the equipment left AMI's control, *i.e.* when shipped, and that the company was not required, as the Commission contends, to wait until the equipment was installed to do so. *See* Tr. at 920–24, 967; Houghton Tr. at 42–43; *see also* Tr. at 644–46; Kilgust Dep. at 596, 606, 1124–25; Ex. 188. Moreover, the PW auditors did take into consideration the possibility that some shipments might be directed to another AMI facility, a possibility heavily relied upon by the Commission to support its argument that the 23% reserve was inadequate. In fact, PW–Chicago did extensive audit work on the issue of diverted shipments and recommended an adjustment of $1,260,000, a figure which accounted for 100% of the gross profit on MIP equipment that they found had been diverted to other AMI branches. *See* Tr. at 808–09; Ex. 122 at PWC 374, 386–88; Ex. 270; Kilgust Dep. at 586, 595–96, 600–01; 1121–25; Lohmeyer Dep. at 369–71, 406–07. The Court finds this evidence more persuasive than the Commission's inflated estimates of the amount of diverted shipments which would have been returned, *see* Tr. at 808–14, espe-

---

**25.** The SEC also argues that AMLC's treatment of the MIP leases was inconsistent with Multigraphics' treatment because AMLC waited until the customer chose the lease financing option before recording it as a direct financing lease. *See* Tr. at 527–30; Ex. 66. However, these treatments were not inconsistent because although the MIP lease would not be a direct financing lease until the customer made that choice, it was nevertheless a sale by Multigraphics at the time of shipment, either to AMLC or the customer directly, albeit that the customers had the option to cancel the sale. *See* Tr. at 507–09, 645–47, 799; Houghton Tr. at 11–15; *see also* Tr. at 711–16, 929.

cially since the evidence demonstrates that many of the diversions were in fact requested by the customer. *See* Ex. 270.

### B. *AMLC's Treatment of MIP Leases*

AMLC was a wholly owned subsidiary of AMI which provided financing for the purchase of AMI equipment through financing leases. *See* Ex. G at PWL 403. As noted above, when the MIP equipment was shipped, Multigraphics recorded a sale to AMLC and AMLC recorded an account payable to Multigraphics. *See* Tr. at 935–38; Dye Decl. ¶ 60. During the initial ninety day period, AMLC recorded the leases in a "leases in progress" account. However, once the customer chose the lease option for payment at the end of the trial period, AMLC recorded the transaction as a "direct financing lease," which is essentially the same as a sale. *See* Dye Decl. ¶ 60; LePage Aff. ¶ 24; Kilgust Dep. at 459–60; Ex. 286.

The parties agree that FAS 13 is controlling with respect to AMLC's treatment of the leases. FAS 13 provides that a lease can be treated as a direct financing lease if the collectability of the lease payments is reasonably predictable, there are no important uncertainties surrounding the amount of unreimbursable costs to be incurred by the lessors, and the lease fits within one of four specific categories listed in ¶ 7 of FAS 13. *See* FAS 13 ¶ 8. The relevant provision of FAS 13 ¶ 7 provides that a lease could be considered a direct financing lease if

> [t]he present value at the beginning of the lease term of the minimum lease payments, excluding that portion of the payments representing executory costs to be paid by the lessor, including any profit thereon equals or exceeds 90 percent of the excess of the fair value of the leased property to the lessor at the inception of the lease over any related investment tax credit retained by the lessor and expected to be realized by him.

FAS 13, ¶ 7(d).

Since a direct financing lease is the functional equivalent of a sale the 90% requirement of FAS 13 ¶ 7 is designed to insure a rough approximation between what is sold, *i.e.* the fair market value of the equipment, and the purchase price, *i.e.* the present value of the minimum lease payments. The present value of the minimum lease payments is determined by multiplying the minimum lease payments, excluding executory costs such as insurance, maintenance and taxes, by the discount rate, *i.e.* the interest implicit in the lease. Since a higher interest rate reduces the present value of the minimum lease payment, it also renders it more unlikely that the 90% requirement of FAS 13 ¶ 7 can be met. Moreover, because the value of the equipment at the end of the lease, *i.e.* the residual value, must be subtracted from the present value of the lease to determine the rate of interest implicit in the lease, a higher residual value necessarily results in a higher discount rate. Finally, since the length of the lease necessarily impacts the residual value of the equipment at the end of the lease, it is likewise a highly relevant factor in determining whether a particular lease qualifies as a direct financing lease. *See* Tr. at 839–40; 848–49; McGovern Dep. at 349–52.

In the 1979 examination of AMLC's books and records, Donald A. McGovern, a PW–Chicago partner who was a senior staff accountant on the AMLC examination, noted two potential problems with AMLC's treatment of the MIP leases; (1) whether AMLC could recognize those leases as direct financing leases on the day the equipment was shipped to the customer, and (2) whether the leases could qualify under the ninety percent test of FAS 13 in view of what appeared to be a twenty-four month term. *See* Ex. GF. Accordingly, he reviewed the terms of a MIP lease and the company's marketing plan, spoke to company officials, consulted with Perks and Keller from PW, and performed calculations to determine if the leases satisfied FAS 13. *See* Tr. at 833–39, 866–67. McGovern's first concern was resolved by the fact that the company did not record the MIP lease as a financing lease until after the trial period had passed. *See* Ex. GF at PWL 4022.

Furthermore, he concluded that the MIP leases did qualify as financing leases under FAS 13 because the lease term included a twelve month bargain renewal period in addition to the original twenty-four month term. *See* Ex. GF at PWL 4022–23; *see also* FAS 13 ¶ 5(f) (defining "lease term" as "the fixed noncancelable term of the lease plus (i) all periods, if any, covered by bargain renewal periods...") In reaching that conclusion he relied on AMLC's representation that the customer could elect to renew the lease for an additional twelve months at the end of the lease term at a thirty-five percent discount. McGovern concluded, and Perks and Keller agreed, that this met the definition of a bargain renewal option under FAS 13 ¶ 5(e).[26] *See* Tr. at 839–41, 853–55, 878, 907–08. However, since the renewal option, although mentioned in the sales plan, was neither included in the MIP lease agreements nor sufficiently supported by other sufficient written evidence, PW therefore required that the company send letters to its customers advising them of the renewal option, *see* Tr. at 839, 842–44, 867–69; McGovern Dep. at 353; Ex. GF at PWL 4022–23; Ex. GJ, and verified that these letters had been sent during the following year's audit. *See* Tr. at 840, 844; Ex. GG at PWL 161 (copy of the letter). Moreover, by the time of the FY 1980 examination the renewal option was included in the written lease agreements. *See* Tr. at 884–85.

The Court accepts as credible McGovern's testimony that it was reasonable to conclude that the aforesaid renewal term met the definition of a "bargain renewal option" under FAS 13. *See* Tr. at 849–51, 853–54, 877–78, 906–09; *see also* Gunther Aff. ¶ 38. Given the size of the equipment, the difficulty that removing it would have caused, and the circumstance that it had a five year life expectancy, it was highly likely that a reasonable businessman would have renewed the lease for another year at a thirty-five percent discount after two years had passed.[27] The Court also accepts PW's position that the state of mind of a reasonably business minded leasee is the dispositive factor in deciding whether the discount offered for the renewal period could qualify as a "bargain renewal option." *See* Tr. at 854–55, 877–78, 907–08; *see also* Tr. at 736–37.

The Commission contends, however, that even if the renewal option did constitute a "bargain renewal option," PW's analysis of AMLC's treatment of the MIP leases was reckless because it used an excessively low residual value in its calculations under FAS 13 ¶ 7(d). AMLC estimated that the residual value was fifteen percent (15%) of the purchase price. *See* Ex. T at 102401–402; Gunther Reb. ¶ 6. This estimate was based upon its determination that the unguaranteed residual value of the repossessed Multigraphics equipment that was 25–36 months old, *i.e.* the estimated value of the property at the end of the lease term was thirty-five percent of the list price and the residual value of the equipment that was 37–48 months old was twenty-five percent of the list price for equipment. Since the lease term was deemed to be 39 months (three years plus the ninety day trial period), the residual value used by PW, 15%, was consistent with the repossession value of the inventory reduced by fourteen percent to reflect the costs associated with resale. *See* Tr. at 731; Gunther Reb. ¶¶ 9–10; Ex. SC at PWL 1117.

The Commission's experts dispute this figure and argue that the residual value should have been approximately thirty-six to forty-six percent of the list price depending upon the terms of the lease. *See* LePage Decl. ¶ 61; Dye Decl. at Ex. B; Tr. at

---

**26.** FAS 13 ¶ 5(e) defined a bargain renewal option as "a provision allowing the lessee, at his option, to renew the lease for a rental sufficiently lower than the fair rental of the property at the date the option becomes exercisable that exercise of the option appears, at the inception of the lease, to be reasonably assured." FAS 13 ¶ 5(e).

**27.** The Court rejects LePage's assertion that the bargain renewal option was improperly calculated because PW did not account for the fact that service was included in the fixed term but not included in the renewal period. *See* LePage Decl. ¶ 58. The credible evidence at trial clearly demonstrated that PW took this factor into account in making their determination. *See* Tr. at 850–51.

723. However, this claim lacks economic plausibility. *See* Tr. at 723, 949. Since, as noted above, a higher residual value necessarily increases the rate of interest implicit in the lease, to accept the Commission's high residual value estimates would require the Court to assume that the lessee was willing to pay an effective interest rate of 25%–35% for the use of the equipment during the lease period, a rate which was considerably above the prevailing market interest rates. *See* Houghton Tr. at 31–33; *see also* Tr. at 723–25.[28]

Moreover, the Commission's experts base their analysis upon information that the evidence demonstrates was inaccurate. Both Dye and LePage relied upon an analysis of repossessed equipment inventory prepared by an AMLC clerk, Nancy Pretto, which was contained in PW's interim work papers. Ex. 290 at PWL 754; *see* Tr. at 727–30; 745–46; Gunther Reb. ¶¶ 8–9. However, McGovern's testimony, which the Court accepts, indicates that he substantially disagreed with her calculations and that he and other PW personnel conducted extensive tests to determine the appropriate value of the repossessed inventory. *See* Tr. at 856–58, 864–66, *see also* 951–56; McGovern Dep. at 557–63; Ex. SC. It was therefore reasonable for PW to rely upon its own figures, which it believed to be more accurate, in arriving at an appropri-

ate residual value for the FAS 13 calculations.

Finally, the Court notes that the calculation of an appropriate residual value requires a subjective analysis of various factors including competition in the market place, the obsolescence of the equipment, interest rates and the use to which the equipment is put, that must be made in light of the accountant's knowledge of both the company and the leases in question.[29] *See* Gunther Reb. ¶ 4. Thus, this is clearly an area in which reasonable accountants can differ, and such reasonable disagreements cannot support an inference of recklessness or fraud.[30] *See* Tr. at 858–60.

### C. *AMLC Allowance for Doubtful Accounts*

AMLC posted a reserve for doubtful accounts in its 1980 consolidated financial statements of $1,729,000. *See* JPTO at 22, ¶¶ 1–2; Ex. 254 at PWL 459. A reserve for doubtful accounts is a figure used to decrease capitalized income by an estimated amount that it is likely the company will not recover due to defaults by customers. The SEC argues that this reserve was inadequate based upon its contention that PW's initial work papers, based solely on historical data, indicated that AMLC should have posted a reserve of approximately $4.4 million. *See* Ex. 199 at PWL 1022.

---

28. In addition, the residual values proposed by the SEC exceed the amount that it cost to manufacture the equipment, which renders those values even more economically unrealistic. *See* Houghton Tr. at 32–33.

29. Indeed, in some situations, use of a lower residual value is thought to be conservative because a residual value which is too high can inflate both the assets and shareholders equity on the balance sheet and the interest income that a company receives. *See* Tr. at 943–44; Gunther Reb. ¶ 5; Ex. T.

30. The Commission also argues that PW's work testing the leases was inadequate. The Court rejects that argument. In the FY 1980 examination of AMLC, the PW personnel focused upon internal controls and accounts receivable. *See* Tr. at 872–74. As part of that audit work, leases, including the MIP leases, were tested to determine if the accounts receivable were accurate and if deferred income was accurately stat-

ed on the balance sheet. *See id.* The MIP leases were tested as part of the general lease portfolio and were not singled out for any special treatment. *See* Tr. at 886–89. In connection with its test of AMLC's leases to determine if they were properly capitalized, PW tested one MIP lease. This lease, which involved a sale of a copier to Illinois Power, was initially categorized as an operating lease, not a direct financing lease. *See* Dye Decl. ¶ 89; Ex. 288 at PWL 1746; Ex. 372 at 33347. However, the Court accepts McGovern's testimony that this was due to the fact that its terms had been erroneously entered into the computer without the bargain renewal term and that when that term was included the lease was properly classified as a direct financing lease. *See* Tr. at 902–04; *see also* McGovern Dep. at 716–18; Gunther Reb. ¶¶ 14–15. In any event, the Court finds no basis to conclude that the testing procedures of PW, even if arguably inadequate, were so divergent from GAAS as to permit a rational inference of fraud.

However, the credible testimony and documentary evidence indicates that PW agreed that the lower reserve—which still required an increase of $300,000 from the prior year—would be adequate because they accepted representations by Mr. Thomas A. Segee, President of AMLC, that the loss rate would be likely to decline in the future. *See* Tr. at 503–05, 512–15; Ex. 200 at PWL 37–38. Segee was optimistic because of new procedures that AMLC was implementing to curtail losses. These included contacting customers within ten days of delinquency, restructuring delinquent customers' lease payments, assessing late charges on those payments, and requiring security deposits from marginal or high risk customers. *See* Tr. at 512–14; Ex. 200 at PWL 37–38. Moreover, Segee argued that the default rate would decrease as the economy improved. Thus, although PW's starting point for its analysis of the reserve was the company's historical experience, the PW auditors in exercising their professional judgment, concluded that these programs would likely result in a lower default rate in the future and therefore agreed that it would be appropriate under GAAP for AMLC to book a lower reserve than PW initially believed was appropriate.

The Court cannot accept as persuasive or credible the testimony of Dye, a Commission expert, that no reasonable accountant could or would take into account future favorable events in calculating a reserve. *See* Tr. at 593–97, 658–61. Indeed, since the very essence of a reserve is an estimate of future events, AICPA states that an auditor, when he is testing a financing company's allowance for doubtful accounts, may consider internal control factors such as credit checks, status checks on accounts, company policies regarding extensions and writeoffs, and continuing collection efforts on accounts which are written off. *See* AICPA, Audits of Finance Companies at 99 (1973) (Ex. 479). These factors directly relate to a company's collection procedures

and lending philosophies, which are vitally important in assessing the sufficiency of a reserve for doubtful accounts.[31] *See id.*

The SEC further contends, however, that PW should not have relied upon Segee's representations that a lower reserve was appropriate because Segee was under pressure from corporate management to fix the reserve at an amount lower than that which he thought appropriate. *See* Perks Dep. at 150–51; Ex. 54 at 1015–44; *see also* Exs. 395–98 (memoranda from Segee to corporate management). The SEC also relies on the deposition testimony of Segee to the effect that Perks and Jerbasi knew that Segee really thought the reserve should be higher, even though he was arguing for a lower reserve to PW. *See* Segee Dep. at 55–58, 101. The Court rejects Segee's testimony as unworthy of belief, especially since Segee, although specifically listed on the SEC's witness list, declined to testify at trial, where the Court would have had the opportunity to observe his demeanor under cross-examination by PW's counsel.

The Court instead accepts as credible Perks' trial testimony, to the effect that he did not know at the time of the audit that Segee was telling management that he thought the reserve should be higher, while at the same time advocating a contrary position to PW. *See* Tr. at 519–20, 553–59, 599–601. The Court therefore concludes that PW reasonably relied upon the representations of management and had no basis to believe during the audit that they were being deceived by company personnel. Indeed, the Court finds that it was not until August or September of 1981, that Perks learned that Segee was telling corporate management something very different than he was telling him.

Even more unpersuasive is the SEC's reliance upon exhibit FY, where in a memo to Jerbasi, Perks wrote that additional time was expended "to rebut client contention that additional reserves were required." Since it has to be obvious to any rational

---

**31.** Indeed, even Dye admitted on cross-examination that had AMLC instituted two of the procedures in question, faster contacts with delinquent creditors and greater security deposits, an auditor would have been remiss if he failed to consider them in ascertaining an appropriate reserve for uncollectible accounts. *See* Tr. at 604–05.

person that PW would not have done additional audit work to persuade management to accept a lower reserve, it is obvious that the memo should have read "additional time was expended to rebut the client's contention that *no* additional reserves were required" and that the omission of the word "no" was a typographical error. This conclusion is not only supported by Perks' testimony, which the Court finds entirely credible, but also by other documentations prepared by PW. *See* Ex. 200, at PWL 37–38.

### D. *Change in Year End for Foreign Subsidiaries*

In 1980, AMI decided to change its fiscal year end for its foreign subsidiaries from June 30 to July 31 so that all the related companies would have the same fiscal year. *See* JPTO at 19 ¶ 1; Tr. at 112. Therefore, AMI closed the books of the foreign subsidiaries on June 30, 1980, as usual, and reported the month of July 1980 as a "stub period" separately on AMI's balance sheet. *See* JPTO at 19, ¶ 3; Ex. 156.

AMI officials represented to PW that the "stub period" was expected to have results similar to July 1979, *i.e.* a net loss of $1 million to $1.5 million. *See* Tr. at 115, 311. Therefore, the company decided, and PW agreed, that AMI would account for the loss as a charge to the retained earnings line on its balance sheet for FY 1981. *See*

JPTO at 19, ¶ 4; Tr. at 115, 311. Jerbasi and LeRoy testified that PW agreed that this treatment would be proper under GAAP and acceptable to PW only if the loss for the stub period was consistent with prior years, *i.e.* in the $1 million to $1.5 million range. *See* Tr. at 115, 118–19, 179, 310–11; Jerbasi Dep. at 1117–21; *see also* JPTO at 19, ¶ 4; Exs. 171–72. However, when in fact the losses sustained in the month of July turned out to be far in excess of what was contemplated,[32] PW required AMI to treat the stub period as a change in accounting principles and to highlight it in its statements for the first quarter of 1981. *See* Tr. at 311–13; Ex. HK; *see also* Exs. 171–72, AY.

The SEC contends that PW knew or should have known that the foreign subsidiaries were improperly recording expenses in the stub period and that the accounting for the stub period by means of a reserve against fiscal 1981 income was inappropriate. The SEC contends further that PW should have expanded the scope of its audit or at the very least issued a qualified opinion.[33]

However, the credible testimony indicates that although Jerbasi and LeRoy were aware that the stub period presented a potential for abuse, they took reasonable steps during the 1980 audit to deal with this problem.[34] Thus, the audit was con-

---

**32.** When AMI released its unaudited reports for the first quarter of FY 1981, the loss was reported as $2.9 million. *See* JPTO at 20, ¶ 6; Tr. at 312–13. Subsequently, the loss was estimated to be approximately $5–10 million and PW decided that the stub period was unauditable. *See* Tr. at 177, 451–52; Exs. 172, 426.

**33.** In the event that an auditor suspects that irregularities exist, GAAS requires that the auditor notify an appropriate level of management that is at least one level above those involved. If after subsequent discussions the auditor continues to believe irregularities may exist, the board of directors or its audit committee should be notified. In addition, the auditor's procedures should be extended in an effort to obtain evidentiary material that will aid in a determination of whether an irregularity exists. Moreover, "when the auditor's examination indicates the presence of errors or possible irregularities, and the auditor remains uncertain about whether [they] may materially affect the financial

statements, he should qualify his opinion or disclaim an opinion on the financial statements." *See* Statement of Accounting Standards ("SAS") at 16, ¶ 14; *see* Tr. at 410–11.

**34.** The Court rejects the testimony of the SEC's expert, Dye, that PW's work in connection with the stub period was inadequate. Cross-examination made it evident that Dye had not seen many of the PW documents evidencing PW's response to the items he identified in his affidavit as "red flags" which would have warranted additional attention from the auditors. *See* Tr. at 607–13. Moreover, in response to questions from the Court, Dye admitted that he did not know what steps PW–UK accountants took in their examination of the June 30, 1980 year end in the UK. *See* Tr. at 620–21. Since it appears that Dye had little, if any, knowledge of what procedures PW performed in examining the June 30 cut-off and the stub period, his testimony that PW's work was inadequate has no probative value.

ducted more thoroughly than usual because the auditors were skeptical of the company due to its poor internal controls and the excessive turnover in its executives. *See* Tr. at 181–82. This is especially true since the Court finds that it was reasonable for both Jerbasi and LeRoy to believe that the main danger posed by the stub period would be that the company would shift 1981 expenses into the stub period so as to enhance the company's income in 1981.[35] *See* Tr. at 129, 181, 311, 448; Jerbasi Dep. at 1187. It was therefore also reasonable for them to believe that the best way of dealing with that possibility was during the 1981 audit, where any improperly recorded expenses in the stub period could be properly charged against 1981 income.[36] *See* Ex. 171; Tr. at 448–49.

Moreover, with respect to the 1980 audit, LeRoy testified credibly that PW had planned upon doing, and did, "extensive" year end cut-off work which included analysis of subsequent events, such as July transactions, to determine if they should be reported in the 1980 financial statements. *See* Tr. at 124–26, 128–30, 147; *see also* Jerbasi Dep. at 1159; Lawrence Dep. at 270–71. Indeed, PW–LA had sent several telexes to foreign PW firms advising them of the change in year end and requesting that they perform detailed cut-off work. *See* Tr. at 124–28; Exs. 157–59, AK, AL, AM. Moreover, the evidence indicates that when notified of problems with AMI sub-

sidiaries reporting 1980 expenses in the stub period, PW–LA promptly followed up on them. These included the so-called "red flag" situations in France and New Zealand, both of which were resolved.[37] *See* Tr. at 131–48; Exs. 161–62 & TB (France), 375, AM, GX, & GY (New Zealand); *see also* Tr. at 627–29.

The Commission also contends that PW should have required disclosure of the abuses in the stub period pursuant to Statement of Accounting Standards 1 §§ 560–61, which require that an auditor investigate and possibly disclose events or transactions that occur subsequent to the balance sheet date but prior to the issuance of the financial statements and auditor's report if they have a material effect upon those documents.

This contention is not persuasive. First, it is not clear that PW knew of the alleged irregularities prior to the time that it issued its report. The SEC received that report on October 14, 1991, the very day that the evidence reflects that PW may have become aware that the loss for the foreign operations was 4.8 million dollars. *See* Exs. 171, 172; Jerbasi Dep. at 1387. It is therefore reasonable to conclude that if the SEC received the document on October 14, that PW had issued its report prior to that date. However, even more importantly, it certainly was not evident to PW as of that time that the larger than expected losses for the stub period constituted expenses that should have been charged to

---

35. The Commission's reliance upon a management memorandum advocating a "poor result" for operations during the stub period, Ex. 483, is misplaced. Although that memorandum noted that losses during the stub period would not affect earnings per share, because they would be charged to retained earnings on the balance sheet, it clearly stated that June expenses should be correctly attributed to FY 1980, and observed that expenditures should be made in July if possible and that shipments would not be made in July unless necessary. *See* Ex. 483. This document, if anything, supports Jerbasi and LeRoy's concern that 1981 expenses, not 1980 expenses, might be shifted to the stub period, Tr. at 447–49, and that efforts might be made to maximize income in 1981.

36. Indeed, the documentary evidence indicates that extensive work was done by PW firms in

other countries in 1981 ascertaining the losses for the stub period. *See* Exs. 89, 90, 91, 94, 96 at 23349; *see also* Ex. 172.

37. Although the SEC relies heavily on the fact that Jerbasi was advised that a former AMI employee (later identified as Bernard Combernous) had anonymously telephoned Dennis Belton, the partner at PW's Paris firm responsible for the AMI audit, to report that AMI subsidiaries in France, Germany and Belgium were improperly recording expenses in the stub period, Jerbasi was not required to accept those complaints as true. Rather, it was entirely reasonable for him to discuss those changes with AMI management, and to discount them when convinced that those complaints from a disgruntled former employee should not be credited. *See* Tr. at 320–21; Jerbasi Dep. at 1361–66; Ex. 164.

FY 1980 rather than FY 1981. The Court therefore cannot conclude that PW acted unreasonably, much less fraudulently, in concluding that these losses could and should be dealt with by charging them against income for FY 1981.

In any event, PW had advised management on September 14, 1980 that if the losses for the stub period were larger than the $1 million to $1.5 million which had been projected they would require additional disclosures in FY 1981 reports. Moreover, Jerbasi subsequently refused to allow the company to charge the July 1980 loss to retained earnings in its 1981 financial statements because of the magnitude of the loss. *See* Tr. at 179; Jerbasi Dep. at 1390–91. In view of these circumstances the argument that additional disclosure should have been made for FY 1980 lacks substantial significance in the context of PW's continuing audit relationship with AMI.[38]

### E. *AMLC Out-of-Balance Condition*

As noted above, AMLC financed sales by AMI's manufacturing divisions to customers. *See* JPTO at 21, ¶ 1. When a sale was financed by AMLC, the manufacturing division would record a sale to and an account receivable from AMLC; AMLC would record an account payable to the manufacturing division and an account receivable from the customer. *See id.* at 21, ¶¶ 2–3. If the customer later cancelled the lease and returned the product to a sales branch, AMLC would record the return on its books and cancel its payable to the manufacturing division, or if it had already paid the manufacturing division, AMLC would record a payable from the manufacturing division. *See id.* at 21, ¶ 4. However, because of the time that it took for AMLC and the various product divisions to make the appropriate entries on their books when a sale was cancelled, the intercompany accounts would normally be unbalanced and would require periodic reconciliation and resolution of differences. *See id.* at 21, ¶ 5; Tr. at 433.

As indicated in the PW–Chicago's memorandum on examination for AMLC, the accounts receivable recorded by the manufacturing divisions from AMLC exceeded AMLC's accounts payable by approximate-

**38.** The Commission also relies upon two additional audit issues which it claims should have led PW to expand the scope of its audit before issuing an unqualified opinion. The first of these consists of a journal entry at Multigraphics which shifted $1.9 million in income from the third to the fourth quarters of FY 1980. *See* JPTO at 22, ¶ 1; Tr. at 100–01; Exs. 173–75, 248 at PWC 2139. However, the evidence which the Court finds credible supports the conclusion that PW adequately dealt with both problems. When PW personnel learned of the journal entry in question, they asked R. Jeffrey Ornstein, Comptroller of Multigraphics, what support he had for making it. *See* Tr. at 101. When advised that it was based solely on Ornstein's opinion, PW found that although the entry was unsupportable, they did not have enough evidence to conclude that it was fraudulent. *See* Tr. at 103–04. They concluded therefore that it was not an "irregularity" of such magnitude that required disclosure to the Board of Directors, although they did require that the entry be reversed and did discuss the unsupported entry with James H. Combes, AMI's Chief Financial Officer, and were very critical of the persons responsible for the entry in the presence of the CEO. *See* Tr. at 104, 403; LeRoy Dep. at 80–86; Jerbasi Dep. at 150–52. PW–Chicago also discussed it in its memorandum regarding internal controls. *See* Ex. 340. Moreover, the evidence overwhelmingly demonstrates that the PW audi-

tors were skeptical of AMI in general and Ornstein in particular and therefore were very careful to verify his representations. *See, e.g.,* Tr. at 99, 106, 403–05; Kilgust Dep. at 138–40.

The second alleged irregularity was an apparent practice at Jacquard of keeping its books open at the end of each quarter to include sales from the following quarter. *See, e.g.,* JPTO at 22, ¶ 1; Gorman Dep. at 30–32. In particular, the SEC contends that when PW learned of a sales cutoff problem between the second and third quarters of FY 1980 it should have expanded the scope of its audit at Jacquard. However, the evidence demonstrates that PW did expand its audit at Jacquard and did extensive work in connection with the year end cut-off. *See* LeRoy Dep. at 1216–23, 1311–14; Ex. 16; *see also* McManamon Dep. at 103–04 (stating that he requested that PW ensure that the cut-off at Jacquard was correct because of prior cut-off problems there). In addition, the practice was stopped in the summer of 1980, when AM corporate management learned of it and new management took over Jacquard. *See* Kremin Dep. at 198–99; Ex. 16. Moreover, the record reflects a significant increase in overall work by PW and internal auditors at Jacquard because of the division's weak internal controls. *See* Ex. 144.

ly $4.7 million. *See* Ex. 254 at PWL 475–76. The most significant out-of-balance conditions were between AMLC and Multigraphics ($1,879,763), Jacquard ($1,209,-428), and Varityper ($1,397,769). *See id.* Perks believed that since the audit work at AMLC indicated that its records were reasonably correct, the discrepancies were primarily the result of problems at the product divisions. *See* Ex. 353.

The evidence demonstrates that when Jerbasi learned of these discrepancies in September 1980 he instructed LeRoy to investigate them. *See* Tr. at 384–85, 440–41; Jerbasi Dep. at 277–78. LeRoy sought explanations about the out-of-balance conditions from PW auditors and AMI personnel and made notations in the workpapers reflecting the results of his investigation.[39] *See* Tr. at 441–42; Jerbasi Dep. at 277–78; LeRoy Dep. at 1646–48. At the conclusion of that investigation and before the financial statements were finally released to the public in October of 1980, LeRoy discussed these issues with Jerbasi, and both agreed that adequate reserves existed to account for the imbalances.[40] *See* Jerbasi Dep. at 283–87, 320–21, 379.

The Court finds that that conclusion was entirely reasonable. The Commission's argument that the $610,000 reserve for orders cancelled subsequent to the end of the fiscal year, which concededly covers the alleged out-of-balance condition, was inadequate cannot withstand scrutiny. Quite aside from the fact that the $1,159,000 figure the Commission contends should have been used (61% of the 1.9 million dollars out-of-balance condition) is questionable, *see* LeRoy Dep. at 851–53, the out-of-balance condition was covered not solely by the $610,000 reserve referred to above but also by the entire $2.1 million reserve for the gross profit on estimated MIP returns, which transactions were a major cause of the out-of-balance condition. *See* LeRoy Dep. at 843–53.

Moreover, the $2.1 million MIP reserve itself included a 100% reserve for all of the MIP transactions that PW knew at the time of the audit had been cancelled plus an additional sum for all returns on all MIP shipments, including those which were known to have been cancelled. Since the MIP reserve covered MIP transactions once, and in some cases twice, it was eminently reasonable, and hardly fraudulent, for PW to conclude that the sums reserved for the out-of-balance conditions, most of which resulted from MIP transactions, were more than adequate to deal with that condition. *See* Ex. 254 at PWL 476; Ex. 122 at PWC 381, 384–85; LeRoy Dep. at 774–75, 843–48.

**39.** In support of its contention that PW did no work on this issue during the 1980 audit, the Commission argues that LeRoy's notations on the AMLC workpapers about the out-of-balance conditions were added to the audit workpapers in 1981 as part of a widespread plot to add documentation to the workpapers. This broad based conclusion of a conspiracy to fabricate workpapers is based principally upon the circumstance that LeRoy added documentation regarding certain audit issues in 1981 in response to comments made during an internal audit and standards review which noted that the documentation on those issues was deficient. The Court, however, accepts as credible LeRoy's testimony that the comments referred to above were indeed made in September 1980 during the audit, especially since the aforesaid audit and standards review made no comment on and found no deficiencies with respect to the out-of-balance condition, although it did comment on other areas where it found inadequate documentation in the workpapers. *See* Tr. at 253, 277–78; Ex. 281. Moreover, the Court also accepts as credible LeRoy's testimony that supple-

menting the audit workpapers with additional documentation in response to an audit and standards review was consistent with PW's normal policy and procedure, *see* Tr. at 242–52, and rejects the SEC's contention that the Court should infer from that circumstance a sinister conspiracy to fabricate workpapers so as to conceal a fraudulent audit.

**40.** The SEC argues that these items were never reconciled during the 1980 audit, basing that claim upon a letter Perks wrote to Jerbasi on September 19, 1980, where he stated that he was "uneasy" that the out-of-balance condition had not been resolved. *See* Ex. 353. However, the evidence indicates that even if the issue was still open at that time it was certainly resolved by the time AMI issued its financial statements in mid-October. *See* Tr. at 433–40; Jerbasi Dep. at 274–76, 298–300. Moreover, LeRoy testified at his deposition that after PW–LA received that letter he called Keller, the PW–Chicago manager on the AMLC audit, and told him that the out-of-balance condition was resolved. *See* LeRoy Dep. at 778–79; *see also* Tr. at 533.

Similar considerations apply with respect to the $1,209,428 imbalance between Jacquard's books and AMLC's. This discrepancy, also largely due to timing differences with respect to returned goods, was similarly covered by a reserve for such goods. *See* LeRoy Dep. at 731, 735, 827–31; Ex. 254 at PWC 476. The workpapers demonstrate that PW auditors did extensive work investigating the collectability of Jacquard's accounts receivable, *see* Exs. JP, JQ, JR, and that based upon that work, PW proposed adjustments to Jacquard's financial statements totaling $2,791,000. *See* Ex. IV. These adjustments, since they took into account all of Jacquard's accounts receivable, including those from AMLC, *see* Mulligan Dep. at 244–46, were therefore clearly sufficient to cover an appropriate gross profit margin for the amount of the AMLC imbalance in its dealings with Jacquard.

LeRoy also investigated the $1,397,769 account difference between the Varityper Division and AMLC. He discussed that difference, along with the other unbalanced accounts, with David C. McManamon, AMI's director of accounting and reporting, and reviewed pertinent documents. *See* Tr. at 443–45; LeRoy Dep. at 738–42, 758–60. He concluded that return and inventory reserves were adequate to cover the gross profit of $490,000 on the imbalance.[41] *See* LeRoy Dep. at 758–60, 766; Ex. 254 at PWL 476. This conclusion was entirely reasonable because the documents demonstrate that there was on Varityper's books both a reserve created for returns, including returns on sales to AMLC, of $600,183,[42] *see* Ex. 20 at PWL 1032; Ex. 371 at JO 19571; *see also* Tr. at 631–37, and an allowance for inventory of $2.3 million. *See* Tr. at 638; Ex. 20 at PWL 1032.

**41.** This testimony was not contradicted by McManamon, who testified only that he did not recall telling LeRoy that there were reserves at Varityper covering the out-of-balance problem.

**42.** The Commission's expert witness' reliance upon the deposition testimony of Michael Prosen, an AMI internal auditor, that the accounts were never reconciled is not persuasive. *See* Tr. at 631–32. Mr. Prosen testified that he did no

## F. *Changes in Accounting Principles*

GAAP requires that changes in the accounting principles and their effect on income be disclosed in the financial statements for the period in which the change is made if those changes have a material effect upon income before extraordinary items or net income. *See* Opinion of the Accounting Principles Board 20 ¶¶ 17, 38 ("APB 20");[43] *see also* FAS 3. As a consequence, PW's inter-office instructions for the 1980 audit required reporting offices to inform PW–LA if there were any significant changes in divisional accounting policies and the reasons for those changes, irrespective of materiality. *See* JPTO at 20, ¶ 1. Accordingly, PW–Chicago reported two possible changes in accounting, one at Multigraphics and one at AM Services. *See id.* at 20, ¶ 2. In addition, Robert H. Lander, AMI's controller, reported a possible change in accounting principles at Varityper. *See id.* Jerbasi and LeRoy considered all three matters and determined that disclosure was not necessary, and that no change in AMI's financial statement was required. Since the Court concludes that that decision was well within the parameters of accounting judgment, it can afford no predicate for an inference of fraud.

The first possible change in accounting principles was a change in the timing of revenue recognition at the Multigraphics Division, which had an effect on net income of $743,000. *See* Ex. 122 at PWC 373; *see also* Ex. 105 at PWM 2757. Prior to the third quarter of FY 1980, Multigraphics recognized revenue on partial machine sales only if all of the parts bearing serial numbers were shipped to the customer. In March 1980 this policy was changed to allow the recognition of revenue at the time that parts of an equipment package were shipped so long as those parts could

work on the account imbalance as of July 1980, *see* Prosen Dep. at 114, and the Court therefore can afford no probative value to expert testimony based upon the opinion of a witness who had no personal knowledge of the facts.

**43.** "The term accounting principle includes 'not only accounting principles and practices but also the methods of applying them.'" APB 20 ¶ 7.

operate independently, *i.e.* on a stand alone basis. *See* Ex. 122 at PWC 373; Tr. at 474–76; LeRoy Dep. at 265–66.

Jerbasi and LeRoy concluded that this was not a change in accounting principles or the method of applying those principles which required disclosure because Multigraphics had always recognized revenue on partial shipments. Thus, they determined that it was only a refinement in the manner in which Multigraphics recognized revenue on partial shipments. *See* Tr. at 474–77; Jerbasi Dep. at 425–31; LeRoy Dep. at 293, 298, 318–24; LeRoy SEC 686–87. Accordingly, LeRoy made a notation on the Multigraphics memorandum on examination, where the PW personnel in Chicago had identified it as a change, that it was only a "refinement of current policy" and was "not considered a change in accounting." *See* Ex. 122 at PWC 373.

The Court accepts as credible Jerbasi's testimony that based upon his experience as an auditor he did not consider this change to be a change in accounting principles. Tr. at 474–77; Jerbasi Dep. at 426, 431; *see also* Combes Dep. at 295–96, 304–08. Moreover, regardless of the merits of his conclusion, it is clear that Jerbasi and LeRoy took reasonable steps to investigate the change, including discussions with AMI personnel and other PW personnel, did research into the applicable accounting literature, and reviewed the merits of the change. *See* Tr. at 477; Jerbasi Dep. at 406–07; LeRoy SEC 686–89; LeRoy Dep. at 274–75, 279–81, 301–02, 323–27. That being so, the Court cannot accept the Commission's argument that fraud may be inferred because of difference in opinion as to accounting judgments.[44]

The other two items considered, the changes at AM Services and Varityper, were deemed to be changes in accounting principle. AM Services, which was responsible for repairing and reworking broken machinery, would receive that equipment from the branches or product divisions and after the reworking was complete would send it to a distribution center. *See* Ex. 250 at PWC 498; Dye Decl. ¶ 167. Prior to FY 1980, this inventory would not be assigned a value until the completion of any such required work. However, in 1980 AM Services assigned an inventory value of $1,840,000 with respect to the equipment that needed to be repaired. *See* Ex. 250 at PWC 498; Dye Decl. ¶ 167; Jerbasi Dep. at 449–50. This accounting change increased AMI's pre-tax income by $923,000. *See* Ex. 250 at PWC 498.

The Varityper change was adopted at the suggestion of Robert Lander in September 1980. Based upon his experience at a similar company, Lander suggested that Varityper capitalize the manufacturing costs for making master type fonts and amortize them over the period of their useful life.[45] *See* Lander Dep. at 157–60. Prior to that time, these costs had been charged as an expense to Varityper's income statement. *See* Dye Decl. ¶ 171; Jerbasi Dep. at 469; Lander Dep. at 158–60. After discussing the change with Lander and other PW personnel, Jerbasi concluded that capitalization was a more appropriate way to treat these assets. *See* Jerbasi Dep. at 471–74. Accordingly, these costs were capitalized with the result that AMI's pre-tax income was increased by $700,000. *See* Dye Decl. ¶ 172; Ex. 249.

---

**44.** The SEC disagrees with Jerbasi's conclusion and states that he improperly "overruled" the PW–Chicago auditors' conclusion that the change was a change in accounting principles. *See* Ex. 122 at PWL 373; Kilgust SEC 180–81; Perks SEC 379–81. However, that argument overlooks the fact that Perks's role in the Multigraphics audit was to supply Jerbasi with information that would assist him in reporting on AMI's consolidated financial statements. *See* Perks Dep. at 906–09; Jerbasi Dep. at 432–38; LeRoy Dep. at 329–30. Thus, although the PW–Chicago accountants certainly acted within their instructions in raising this issue, it was up to

Jerbasi, as the engagement partner, to make the final decision regarding the appropriate accounting treatment for these items. *See* Jerbasi Dep. at 432–38; LeRoy Dep. at 293.

**45.** A master type font is a strip of film that reproduces the various specialized styles and sizes in which a typesetter can print the letters of the alphabet. *See* Lander Dep. at 166–67. The master type fonts were expensive to produce, but once the master was created, copies could be made from it for a period of time. *See id.* at 158, 166–67.

However, although Jerbasi and LeRoy concluded that these changes at AM Services and Varityper were indeed changes in accounting principles,[46] they did not require AMI to disclose those changes because they concluded that the aggregate of both changes did not have a material impact upon AMI's consolidated financial statements.[47] *See* Tr. at 480–81; Jerbasi Dep. at 451–57, 463–65; LeRoy Dep. at 349–52, 364, 370–78.[48] The SEC argues that this decision was reckless and maintains that PW should have required disclosure of any item which exceeded five to ten percent of AMI's net income which, according to the Commission's calculations, would have created a materiality range of $500,000 to $1,000,000 for purposes of this audit. *See* Dye Decl. ¶¶ 48, 56–57.

Materiality is defined in the accounting literature as "[t]he magnitude of an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person would have been changed or influenced by the omission or misstatement." [49] *See* Statement of Financial Accounting Concepts No. 2: Qualitative Characteristics of Accounting Information ("FAS Con 2") at Glossary of Terms & ¶ 132. While the literature reflects that the 5 to 10 percent range relied on by the Commission is "useful," *see* FAS Con 2 ¶ 167, that literature also makes clear that there are no generalized standards for determining the materiality of a particular "judgment item," *see id.* ¶ 131, because a materiality decision is a qualitative one requiring consideration by an accountant of a wide range of information factors including, *inter alia,* the nature of the item under consideration; whether it arises from a routine or abnormal transaction; the size of the enterprise; and the company's financial condition and trends in profitability. *See* FAS Con 2 ¶¶ 123–31, 170. Moreover, FAS Con 2 explicitly states that "[m]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment." FAS Con 2 ¶ 125.

Tested by that standard, the Court finds as a matter of fact that PW's conclusion, *i.e.* that the $1.6 million dollar effect on AMI's consolidated financial statements from the two changes in accounting principle referred to above was not material, was reasonable and certainly not so far beyond the pale of rationality as to permit the inference of fraud. AMI's gross revenues were approximately $1 billion dollars in FY 1980. However, its net income—before several non-recurring extraordinary credits—was a loss of $1.5 million dollars. *See* Tr. at 485–88. Given the obviousness of the company's poor performance in view of its size, and its trend in earnings, it was well within the parameters of acceptable judgment for Jerbasi to conclude that the disclosure of the changes in accounting principle referred to above would not have changed or influenced the judgment of a reasonable investor who utilized or relied

---

**46.** Jerbasi testified at trial and at his deposition that he was not then sure that the AM Services change was truly a change in accounting principle, but that he assumed that it was. *See* Tr. at 480; Jerbasi Dep. at 451–52.

**47.** Although both Jerbasi and LeRoy testified that they made this decision in September 1980, it was documented by a schedule prepared by LeRoy in response to an Audit and Standards review and added to the workpapers in 1981. *See* Tr. at 248–55; 381–2; Ex. 249. As noted above, adding notations to the workpapers following an ASR Review was not unusual. *See supra* note 37. The Court, therefore, rejects the Commission's contention that this testimony should not be accepted as credible because of this circumstance.

**48.** Jerbasi also testified at trial that even if the Multigraphics item was a technical change in accounting, all three items aggregated would still not be material. *See* Tr. at 481–82.

**49.** Courts have applied a similar definition of materiality in securities fraud cases. The Supreme Court has stated that "an omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 240, 108 S.Ct. 978, 983, 988, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *see also* FAS Con 2 ¶¶ 163–65 (providing guidance on materiality from court decisions).

on that financial statement. *See* Tr. at 572–74.

This is especially true since PW had forced AMI to record approximately $10 million in adjusting entries to its books. Moreover, the reasonableness of Jerbasi's conclusion is further supported by the substantial impact that the issuance of the financial statements had on AMI's stock prices, which dropped dramatically on the day AMI's financial statements were released.[50] *See* Tr. at 575–77; Ex. LB. In addition, AMI's investment bankers postponed a planned public offering based in part upon those financial statements.

### G. *Year End Adjustments*

PW initially proposed total adjustments to AMI's consolidated financial statements which would have reduced AMI's pre-tax income by approximately $14 million.[51] *See* Tr. at 364; Ex. 127. AMI agreed to record $10 million of these adjustments to its final consolidated financial statements. *See* Tr. at 363–64; LeRoy Dep. at 582–84, 600–01; Ex. 127. PW concluded that only $1.9 million of the $4 million adjustments which AMI did not agree to record actually should have been booked because the remainder reflected subjective or "soft" figures. *See* Tr. at 364–65; Ex. 127. However, Jerbasi determined that of that $1.9 million, $1 million could be the subject of reasonable disagreement between management and PW and that the balance was not material in relation to the financial statements taken as a whole. *See* Jerbasi Dep. at 717–21.

The largest disparity between the amount of an adjustment proposed and that recorded occurred in connection with the examination of Multigraphics' books

and records. Acting pursuant to its instructions from PW–LA, PW–Chicago recommended that AMI record $5.4 million dollars in adjusting entries, which primarily reflected an estimate for sales returns for Multigraphics. *See* Ex. 122 at PWC 374; Tr. at 197; Jerbasi Dep. at 564–66, 932–34. However, in an argument considered by Jerbasi to be "ridiculous," Multigraphics management, Messrs. Kaufman and Ornstein, vehemently opposed *any* adjustments to Multigraphics' books and asserted that the PW–Chicago auditors had unfairly and improperly recommended unwarranted adjustments. Tr. at 354–55, 360–61; *see* Tr. at 333–34; Jerbasi Dep. at 632; Ex. 68; *see also* Tr. at 90, 99, 523–24.

In order to resolve these arguments and to determine the appropriate level of adjustments necessary for an unqualified opinion, Jerbasi had extensive conversations with both PW–Chicago auditors and AMI corporate management, including Chief Financial Officer James H. Combes. The conversations with PW–Chicago personnel included meetings in Chicago on September 3 and 4, where the PW–Chicago auditors explained in great detail the basis for their conclusions in all of their memoranda on examination. *See* Tr. at 66, 198–99, 350–51, 356, 419–20; Jerbasi Dep. at 328–32; LeRoy Dep. at 55–58, 554–68. These meetings led both Jerbasi and LeRoy to conclude that the PW auditors in Chicago had taken an "ultra-conservative" approach to their audit of Multigraphics. LeRoy Dep. at 568–80, 634–43, 1736–39; *see* Tr. at 358.

Moreover, Jerbasi had several telephone conversations with Perks regarding the subjectivity of the estimate of returns and the range of reasonable adjustments.[52] *See* Tr. at 356–59, 525–26; Jerbasi Dep. at

---

**50.** The materiality of information released to the market can be tested by its impact upon stock prices even though stock prices may be influenced by factors other than accounting information. *See* FAS Con 2 ¶ 168; Tr. at 575.

**51.** Typically, when accountants examine a company's books and records they propose adjusting entries with respect to matters that arise during the audit. The company must then determine the amount of those entries that it will record. This process invariably involves consultations

with the accountants to determine what amount of adjusting entries are required so that the accountants can issue an unqualified opinion. *See* Tr. at 57–59, 355; Combes Dep. at 657–59; LeRoy Dep. at 132–35.

**52.** Contrary to the SEC's contention, the credible evidence overwhelmingly established that Perks recognized that the final decision about the level of adjustments necessary for an unqualified opinion was Jerbasi's. *See* Tr. at 201–02, 361, 422; Jerbasi Dep. at 361, 600–03, Perks

584–86; Perks Dep. at 762; *see also* Tr. at 199; LeRoy Dep. at 598–99, 600–02. Jerbasi's discussions with AMI personnel included meetings with Kaufman and Ornstein in Chicago during the visit noted above. Jerbasi also had numerous conversations with Combes, including a twelve hour flight from London, England on September 7, 1980 [53] during which the audit was discussed in detail, and a meeting with LeRoy, Combes and Lander on September 10, 1980. *See* Tr. at 70–71, 198, 351–53, 356, 431–32; Combes Dep. at 614–15. These discussions convinced Jerbasi that the company would be taking steps to reduce the amount of equipment that would be returned in the future. *See* Tr. at 358, 420–22; Jerbasi Dep. at 578–82.

Since the proposed adjustments were a conservative and subjective *estimate* of fu-ture returns, and because AMI would and could take steps to reduce future sales returns, Jerbasi decided that, in light of the consolidated financial statements as a whole, an adjusting entry for Multigraphics in the range of $3.5 million to $4.1 million would be an adequate basis upon which PW could issue an unqualified opinion.[54] *See* Tr. at 357–61, 419–24; Jerbasi Dep. at 578–86, 590–95, 600–05; LeRoy Dep. at 618–29, 634–43. On September 10, 1980, AMI agreed to book adjusting entries in the amount of $3.5 million for Multigraphics.[55] The Court concludes, as a matter of fact, that Jerbasi's decision to issue an unqualified opinion on that basis was reasonable and was well supported by his discussions with PW personnel, AMI officials, as well as his own knowledge of the company's financial condition.[56]

Dep. at 632. Moreover, the evidence also establishes that when he learned that Jerbasi had accepted a $3.5 million adjustment, Perks was not upset about it but felt that Jerbasi had made an informed judgment based upon all of the available information in his possession. *See* Tr. at 526; Jerbasi Dep. at 571; Perks Dep. at 745, 754–55; *see also* Tr. at 200–02.

53. Jerbasi had gone to London to meet with AMI personnel and members of the PW England firm to discuss the audit and fee problems.

54. To the extent that Combes's deposition testimony can be characterized as contradicting Jerbasi's testimony that he told Combes that if he did not book $3.5–4.1 million in adjusting entries he would not render a clean opinion, *compare* Combes Dep. at 598–99 *with* Tr. at 359, the Court finds Jerbasi's testimony credible and accepts that version.

55. Shortly after AMI decided to book $3.5 million in adjustments to its financial statements, LeRoy telephoned Kilgust to request that Kilgust put into the Multigraphics memorandum on examination the fact that a $3.5 million dollar adjustment was booked. Kilgust said that he thought the support should be added by PW–LA because they were more familiar with the company as a whole. *See* Tr. at 207–13; Kilgust Dep. at 319–26; LeRoy Dep. at 604–10. Having considered all of the evidence on this issue, the Court accepts LeRoy's testimony as credible and rejects the SEC's contention that this was done as part of a scheme to falsify the workpapers.

56. The Commission raises three additional matters having little impact on AMI's consolidated financial statements as evidence of PW's reck-less conduct in connection with this audit. The first contention is that PW failed to conduct a second partner review on a timely basis as required by PW's internal policies. *See* Ex. 44. However, the deposition testimony of Edward R. Cheremy, the PW partner assigned to perform the second partner review, establishes that he had substantially reviewed the audit through discussions with LeRoy and a preliminary review of the important documents prior to the date that the company issued its financial statements to the public even though he did not finally complete his review until December 1980. *See* Cheremy Dep. at 59–67, 147–51, 172–73, 221–23; Ex. 43.

The next contention concerns the fact that PW did not obtain a management representation letter, *i.e.* a letter from management stating that the financial statements accurately reflect the company's financial condition, from the divisional management of the Multigraphics division as required by PW internal policies and the audit plan. However, the testimony of the PW auditors, which the Court accepts, overwhelmingly supports the reasonableness of that decision. Kaufman and Ornstein had opposed any adjustment proposed by PW and had in other ways so impaired their credibility with PW that it was entirely sensible for Jerbasi and LeRoy to conclude that a letter from them would have provided precious little assurance in any event. *See* Tr. at 89–99, 332–33, 521–22. Moreover, GAAS does not require PW to obtain a letter of representation from divisional management, *see* Tr. at 336–40; Affidavit of William J. McNamara ("McNamara Aff.") ¶ 25, and PW did obtain representation letters from AMI corporate management for the consolidated financial statements. *See* Tr. at 400–01; Exs. CH, CI; *see also* Ex. BU.

## DISCUSSION

As a prerequisite to its claim for injunctive relief, the Commission must first establish by a preponderance of the evidence that the PW defendants violated the securities laws. The elements of liability for violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 in an injunction proceeding are the following: (1) a misrepresentation or omission (where a duty to speak exists); (2) of a material fact; (3) made with scienter; and (4) made in connection with the purchase or sale of securities. *See, e.g., Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 1958, 64 L.Ed.2d 611 (1980); *SEC v. Tome,* 638 F.Supp. 596, 620 (S.D.N.Y.1986), *aff'd,* 833 F.2d 1086 (2d Cir. 1987), *cert. denied, Lombardfin S.p.A. v. SEC,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213, and *Transatlantic Financial Co. v. SEC,* 486 U.S. 1015, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *SEC v. Scott,* 565 F.Supp. 1513, 1526–27 (S.D.N.Y.1983), *aff'd,* 734 F.2d 118 (2d Cir.1984).

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that actions under Section 10(b) of the Exchange Act and Rule 10b–5 require an allegation of "'scienter'—intent to deceive, manipulate, or defraud," *id.* at 193, 96 S.Ct. at 1381 (citation omitted), but left open the question of "whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.* at 193–94 n. 12, 96 S.Ct. at 1380–81 n. 12. However, since *Ernst,* most courts have concluded that recklessness can satisfy the requirement of scienter in a securities fraud action against an accountant. *See, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982);

*McLean v. Alexander,* 599 F.2d 1190, 1196 & n. 12 (3d Cir.1979); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44–47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1044–45 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

"Recklessness" in a securities fraud action against an accountant is defined as

> highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*McLean, supra,* 599 F.2d at 1197 (quoting *Sundstrand Corp., supra,* 553 F.2d at 1044); *accord Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120–21 (2d Cir.1982); *Rolf, supra,* 570 F.2d at 47; *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 163 (S.D.N.Y.1990). That standard requires more than a misapplication of accounting principles.[57] The SEC must prove that the accounting practices were so deficient that the audit amounted to no audit at all, *see McLean, supra,* 599 F.2d at 1198, or "an egregious refusal to see the obvious, or to investigate the doubtful," *Johnson v. Arthur Andersen & Co.,* 762 F.Supp. 599, 601 (S.D.N.Y.1991) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y. 1989)), or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts. *See CL–Alexanders Laing,* 739 F.Supp. at 163. Tested by that standard, the Court

---

Finally, the Commission contends, and PW concedes, that PW failed to eliminate a portion of intercompany profit associated with inventory in transit in connection with consolidating all of the various divisions and subsidiaries into one consolidated financial statement, which had an effect of increasing AMI's pre-tax income by $600,000. *See* JPTO at 23, ¶ 1; *id.* at 130, ¶ 2 (Defendant's Contentions of Fact). Although this was concededly an error in accounting,

there is no evidence that it resulted from anything other than honest error, and in any event it was clearly not material.

**57.** Indeed, as Judge Pollack has held, deviation from accounting standards or guidelines alone would not "perforce thereof spell negligence in an audit." *Mishkin v. Peat, Marwick, Mitchell & Co.,* 744 F.Supp. 531, 538 (S.D.N.Y.1990).

concludes that the Commission has failed to demonstrate the requisite scienter and consequently has failed to prove that PW violated Section 10(b), Rule 10b–5 or Section 17(a)(1).

 The Commission places its principal reliance upon the accounting treatment of the MIP leases. However, as noted above, these items involved complex issues of accounting as to which reasonable accountants could reach different conclusions. Indeed, at trial the Court heard diametrically opposing views from experts as to the reasonableness of PW's accounting and audit judgments. It follows that no finding of fraud or recklessness can rationally be made in this case. *See Oleck v. Fischer,* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,898, at 95,701, 1979 WL 1217 (S.D.N.Y.1979), *aff'd,* 623 F.2d 791 (2d Cir. 1980); *see also Reilly v. Pinkus,* 338 U.S. 269, 274, 70 S.Ct. 110, 113, 94 L.Ed. 63 (1949); *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902). This is especially true since the Court concludes, as a matter of fact, that Messrs. Gunther and Houghton, who testified on behalf of PW, were more credible, persuasive and reasonable in their analysis and conclusions than were the SEC's expert witnesses, Messrs. Dye and LePage.

Nor do the melange of other alleged deficiencies, including those related to the stub period for foreign subsidiaries, the out-of-balance condition, or the changes in accounting principles, come close to establishing fraud or recklessness. The testimony of the PW defendants, especially Jerbasi, Perks and LeRoy, which the Court accepts as both credible and persuasive, established that these issues were adequately addressed during the audit and that the procedures employed to resolve these issues conformed to the requirements of GAAP and GAAS.[58] The Court therefore concludes, that at best the Commission has established that in some instances a reasonable accountant would, might or should have handled the matter differently. It has utterly failed to prove, however, that what the PW defendants did was "highly unreasonable" or "an extreme departure from the standards of ordinary care" used in the accounting profession. *Cf. CL–Alexanders Laing, supra,* 739 F.Supp. at 164.

The same is true with respect to PW's decision to issue an unqualified opinion. *See* McNamara Aff. ¶ 21. The credible testimony indicates that an unqualified opinion was rendered after reasonable investigation and extensive discussions both with company officials and among PW personnel. *Cf. Oleck v. Fischer,* 623 F.2d 791, 795 (2d Cir.1980). Indeed, having observed Mr. Jerbasi's testimony and having thereby gained at least some insight into his personality, the Court finds the suggestion that he "capitulated" to management's pressure highly improbable. This is especially so in view of the fact that PW forced the company to record $10 million dollars in adjusting entries, resulting in a reduction of net income to the pre-tax amount of negative $1.5 million dollars, with the adverse effect upon AMI's stock prices and proposed public offering described above.[59]

---

**58.** *See, e.g.* McNamara Aff., who concluded (1) that the scope of audit work concerning the planned change in year end for the foreign subsidiaries was appropriate, and that there was no evidence which would warrant expanding it; (2) that the assessment of the intercompany account differences was reasonable under the circumstances; and (3) that the decisions regarding the changes in accounting principles were also reasonable. *See* McNamara Aff. ¶¶ 19, 23–24.

These conclusions were based upon Mr. McNamara's extensive experience in auditing large multinational companies, *see id.* ¶¶ 5–8, and a thorough review of the workpapers and deposition testimony. *See id.* ¶¶ 10–13. The SEC, which bears the burden of proof, chose not to cross-examine this witness, whose direct testimony was submitted by affidavit.

**59.** The SEC's reliance upon *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27 (2d Cir.1976), in support of its contention that scienter exists here is misplaced. In that case, the auditors report represented that certain transactions having an enormous impact upon the company's financial statements had been consummated and that current and deferred income had been realized, when in fact the transactions by their terms would not have been completed nor would revenue have been received until several months after the accountants issued their opinion as to the company's financial statements. *See id.* at 36–37. In addi-

Moreover, the credible evidence overwhelmingly established that at all times during this audit the PW auditors in general and Messrs. Jerbasi, Perks, and LeRoy, in particular, acted in good faith and conducted what they honestly believed to be a professional and thorough audit of a troubled company with poor internal controls. *E.g.* Tr. at 392–93. Since "there is no indication that Congress intended anyone to be made liable [under Section 10(b) and Rule 10b–5] unless he acted other than in good faith," *Ernst & Ernst, supra,* 425 U.S. at 206, 96 S.Ct. at 1387, this Court's finding of good faith precludes a finding of liability here.

The Commission's contention that PW's alleged concern for maintaining and keeping a client and the fees associated with that relationship permits an inference of fraud is unconvincing. It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). The Court therefore declines the Commission's invitation to look with a jaundiced eye at each accounting decision made during a complex audit merely because of an accountant's economic motivation in maintaining an ongoing relationship with a client.[60]

■■■ It follows that the Commission has also failed to establish the PW defendants liability for aiding and abetting violations of the securities laws by AMI officials. The well-known elements for aiding and abetting a violation of the securities laws are:

(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;

(2) "knowledge" of this violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*Mishkin v. Peat, Marwick, Mitchell & Co.,* 744 F.Supp. 531, 551–52 (S.D.N.Y.1990) (quoting *IIT v. Cornfeld,* 619 F.2d 909, 913 (2d Cir.1980)). The Court's conclusion that the PW defendants did not act recklessly is dispositive on this issue. Although it is uncertain whether recklessness is sufficient to establish the scienter required for aiding and abetting liability, *see, e.g., Sirota, supra,* 673 F.2d at 575; *Mishkin, su-*

---

tion, there was also evidence establishing that the accountants knew of the "fictitious" nature of the transactions; prepared misleading journal entries; withdrew their original opinion stating that the income was "unrealized" and replaced it with a statement that the income was "deferred" accompanied by a misleading statement qualifying the opinion; and failed to respond to a number of other "[flashing] danger signals." *See id.* at 34–36. Based upon that record, the Court of Appeals concluded that the accountants were liable for "their active participation in the preparation and issuance of false and materially misleading accounting reports upon which [the plaintiff] relied to his damage." *Id.* at 37. No such evidence exists here.

**60.** In support of its fee argument, the Commission relies heavily upon a dispute that arose between Michael J. Lawrence, a partner at the PW firm in the United Kingdom responsible for the AMI work in the UK, and AMI Management regarding the level of fees being paid to PW–UK. Jerbasi, as the overall partner responsible for the AMI engagement, was naturally forced to step in and resolve this dispute and in doing so was at times very critical of Lawrence. The Court has heard the testimony, *see* Tr. at 459–74, and reviewed the exhibits and deposition excerpts related to this issue and finds that it adds little to the Commission's case. This unpleasant situation and the fact that Jerbasi thought Lawrence was unreasonable in his demands and imprudent in his actions hardly supports the inference that Jerbasi committed securities fraud.

The Court finds frivolous the Commission's suggestion that PW had an "investment" in AMI. The evidence is uncontradicted that at no time did PW have any equity interest in AMI which would impair its independence as auditors. *See* Tr. at 297–301. Furthermore, it defies economic reality to suggest that a professional firm which extends a discount or does not bill its full fee for its "learning curve" in order to retain and accommodate a client has compromised its independence merely because it may colloquially refer to that circumstance as "an investment" in the client. Indeed, this argument reflects the Commission's general approach to this case, *i.e.* to seize and grasp any fact to support any argument, however irrational, to justify its claim of fraud. *See supra,* note 39. The Court can only conclude that in this case fraud, like evil, exists principally in the eye of the beholder.

*pra,* 744 F.Supp. at 552, it is nonetheless obvious that an absence of recklessness precludes liability for aiding and abetting a fraud. *See Oleck v. Fischer,* 623 F.2d 791, 795 (2d Cir.1980). Thus, since scienter has not been established here, the Court need not decide whether a primary violation was committed by company management or whether the PW defendants substantially assisted that primary violation.

In any event, even if the Commission had demonstrated a violation of those provisions of the laws, such as § 17(a)(2)–(3) of the Securities Act, which do not require scienter, the SEC would still have to demonstrate the need for injunctive relief under Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act. *See Aaron, supra,* 446 U.S. at 696–700, 100 S.Ct. at 1955–1958; *Tome, supra,* 638 F.Supp. at 628; *Scott,* 565 F.Supp. at 1535–36. The test for injunctive relief is "whether the defendant's past conduct indicates that there is a reasonable likelihood of further violation in the future." *SEC v. Monarch Fund,* 608 F.2d 938, 943 (2d Cir.1979); *see SEC v. Bausch & Lomb,* 565 F.2d 8, 14 (2d Cir.1977); *see also United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). In weighing whether or not to grant an injunction a court may also consider the degree of scienter involved in the violation, the sincerity of a defendant's assurances against future violations, and the isolated or recurrent nature of the violations. *See Bausch & Lomb, supra,* 565 F.2d at 14; *SEC v. Universal Major Indus.,* 546 F.2d 1044, 1048 (2d Cir.1977), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). Moreover, the presence or absence of scienter would still be an "important" factor to be considered by a district court "in exercising its equitable discretion to decide whether or not to grant injunctive relief."

*Aaron, supra,* 446 U.S. at 701, 100 S.Ct. at 1958; *see id.* at 703, 100 S.Ct. at 1959 (Burger, C.J., concurring); *see also SEC v. Haswell,* 654 F.2d 698, 699 (10th Cir.1981).

The Commission has shown no basis for injunctive relief in this case. As noted above, the PW defendants acted in good faith and made reasonable professional judgments in connection with the issues that arose during the audit. In view of that circumstance, there is no basis for an injunction. *See SEC v. Arthur Young & Co.,* 590 F.2d 785, 789 (9th Cir.1979). Moreover, since it is uncontroverted that the Commission has not alleged any other violations of federal law by Jerbasi, Perks and LeRoy either prior to or subsequent to the conduct complained of herein, *see* JPTO at 6–8, ¶¶ 12–14; Tr. at 261, 392, 533, it would be irrational for the Court to conclude that they are the type of persistent securities law violators who should be enjoined.[61]

Similarly, the Court can discern no basis upon which an injunction should be entered against PW. The Commission has put forth no evidence that PW as a firm acted recklessly or has engaged in a persistent pattern of reckless auditing which would justify the conclusion that the firm will violate the securities laws in the future.[62] Indeed, the SEC contends only that one allegedly improper audit performed over ten years ago by individual partners warrants a firmwide injunction. However, there has been no evidence that the firm's national leadership ignored audit issues brought to its attention or otherwise unduly pressured any accountant to placate corporate management. Thus, the Court sees no basis for an injunction against the firm on the basis of these isolated acts, even assuming arguendo that a violation of any provision of the securities laws had

---

61. In addition, an injunction would be especially inappropriate against defendant LeRoy since he has left public accountancy and has no present plans to return to that profession or to obtain any employment involving SEC registrants. Note 10, *supra; see Universal Major Indus., supra,* 546 F.2d at 1048.

62. The SEC alleged securities law violations against PW in two civil actions filed in 1978 which were settled without an admission of liability by PW. *See* JPTO at 8, ¶ 15; *id.* at 109, ¶ 246 (Plaintiff's Contentions of Fact). That circumstance affords no basis for injunctive relief against the firm in view of the Court's Findings of Fact and Conclusions of Law referred to above.

been established. *Cf. SEC v. World Gambling Corp.*, 555 F.Supp. 930, 933 (S.D.N.Y.), *aff'd*, 742 F.2d 1440 (2d Cir. 1983).

Furthermore, the Commission seeks injunctive relief based upon events which occurred in 1980. However, it took the Commission approximately five years to file its complaint and another six years for the action to proceed to trial. This delay weighs heavily against an injunction, especially where, as here, the intervening years have seen a large scale change in the firm's leadership. Affidavit of Eleanor C. Mertson ¶ 5. *See Monarch Fund, supra*, 608 F.2d at 943; *SEC v. John Adams Trust Corp.*, 697 F.Supp. 573, 578 (D.Mass.1988); *SEC v. Warner*, 674 F.Supp. 836, 839 (S.D.Fla.1987). For all of these reasons the Commission's request for injunctive relief is in all respects denied. *See SEC v. Unifund Sal*, 910 F.2d 1028 (2d Cir.1990).

## CONCLUSION

For the reasons set forth above, judgment shall be entered in favor of the defendants dismissing the complaint in this action with prejudice. The Clerk of the Court shall enter an appropriate judgment and close the above-captioned action.

It is SO ORDERED.